[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 24, 2008
THOMAS K. KAHN
CLERK

_____

No. 05-10210

_____

D. C. Docket No. 01-01399-CV-HES

ERNEST C. DOWNS,

Petitioner-Appellant,

versus

WALTER A. MCNEIL,
ATTORNEY GENERAL OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(March 24, 2008)**

Before BLACK, HULL and WILSON, Circuit Judges.

BLACK, Circuit Judge:

Ernest Charles Downs is a prisoner on Florida's death row. After exhausting his opportunities for state court review, he turned to the federal courts on December 12, 2001, filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court dismissed the petition as untimely because it was filed eight days beyond the one-year limitations period provided by 28 U.S.C. § 2244(d)(1).

Regardless whether the petition was timely, Downs contends he is entitled to equitable tolling because of egregious conduct by his counsel throughout his postconviction proceedings. In the alternative, Downs argues on appeal that he is entitled to a hearing on the merits of his petition because he has made a colorable showing that he is actually innocent of a capital offense. We conclude the facts he has alleged, if true, would entitle him to equitable tolling for a period equalling, at a minimum, the eight days by which he missed the statutory limitations period. Therefore, we vacate the district court's dismissal of the petition and remand for an evidentiary hearing on the facts underlying Downs' request for equitable tolling.

## I. FACTS AND PROCEDURAL HISTORY

### A. Conviction and Early Appeals[1]

Following a jury trial, Downs was convicted of first degree murder and conspiracy to commit murder for the contract killing of Forest Jerry Harris in 1971. He was sentenced to death.

In 1987, the Florida Supreme Court reversed Downs' sentence after determining he had been prevented from presenting evidence at sentencing that he had not shot the victim. During resentencing proceedings, Downs and other witnesses testified another conspirator had fired the fatal shots. The jury voted eight to four to recommend a capital sentence, and the trial judge reimposed the death penalty. In September 1990, the Florida Supreme Court affirmed Downs' sentence.

### B. CCRC-N

Florida's Capital Collateral Regional Counsel (CCRC) is "an entity created by the Florida Legislature to provide post-conviction representation to indigent death row inmates." *See Sanchez-Velasco v. Sec'y of Dep't of Corr.*, 287 F.3d 1015, 1017 (11th Cir. 2002) (citing Fla. Stat. §§ 27.701-708). In 1992, CCRC attorneys in Tallahassee, Florida began representing Downs.

---

[1] A full discussion of the facts of Downs' underlying conviction can be found in *Downs v. State*, 572 So. 2d 895 (Fla. 1990) (Barkett, J.).

CCRC operates from several independent regional offices, *see* Fla. Stat. § 27.702(1); Downs' attorneys worked in the Northern Office (CCRC-N). During the years CCRC-N represented Downs, at least seven attorneys worked on Downs' case.[2]

C. Later Postconviction Proceedings[3]

In 1992, Downs' counsel filed a state postconviction motion under Fla. R. Crim. P. 3.850, challenging Downs' capital sentence on numerous grounds, including the withholding of exculpatory evidence and the ineffectiveness of both his trial and resentencing counsel. The postconviction motion remained pending for five years. When the motion was denied in 1997, Downs appealed. The Florida Supreme Court affirmed the denial of his postconviction motion on May 19, 1999, *Downs v. State*, 740 So. 2d 506 (Fla. 1999), and issued its mandate on October 18, 1999.

While Downs' postconviction motion was pending, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) took effect, establishing a one-year

---

[2] Downs' attorneys operated as a unit and maintained shared responsibility for the case; therefore, we treat the office as we would a law firm, referring to the office's attorneys as a practice group, rather than by name. By doing so, we do not mean to suggest that the wrongs allegedly committed in Downs' case are representative of the work of CCRC-N or its attorneys in other cases.

[3] The district court did not hold an evidentiary hearing to determine the truth of Downs' allegations before dismissing his habeas petition; therefore, no facts have been found. We set forth the facts as alleged by Downs in the light most favorable to him, drawing all reasonable inferences in his favor.

limitations period for state prisoners to seek federal habeas corpus review. 28 U.S.C. § 2244(d)(1). Aware of the limitations period imposed by AEDPA and eager to safeguard his right to federal review, Downs contacted CCRC-N immediately after the Florida Supreme Court denied the appeal of his postconviction motion. In a letter dated May 22, 1999, Downs asked his counsel to (1) petition for rehearing on the denial of his Rule 3.850 motion; (2) prepare a state habeas petition (the next step in Florida's postconviction review process); and (3) file a petition in federal court "asking that [his] case be held in abeyance pending disposition of the state writ." The following week, Downs sent a second letter to counsel, providing a detailed explanation of the history of his case and requesting a visit from counsel to discuss the contents of his postconviction motions. Four months passed with no response from counsel.

Finally, on September 28, 1999, a CCRC-N attorney responded to Downs' letter. The attorney apologized for his delayed response, explaining, "I find myself interrupted by an emergency every time I try to work on your affidavits or consider our next move and your ideas. . . . [O]nce again, I write to inform you there will be delay before I can return my attention to your case."

Approximately one month later, on October 18, 1999, the Florida Supreme Court issued its mandate denying Downs' postconviction motion, and Downs' federal habeas limitations period began to run.

Seven months later, on May 26, 2000, Downs' attorneys sent a letter asking Downs to review a draft of a proposed state habeas petition, and sometime later that summer, a CCRC-N attorney told Downs the state habeas petition had been filed—an act that would have tolled the federal habeas limitations period while simultaneously providing Downs with additional state court review. *See* 28 U.S.C. § 2244(d)(2) (providing that time when properly filed application for post-conviction relief is pending in state court shall not be counted toward one-year limitations period). However, the lawyer's representation was a lie: no state petition had been filed.

On September 3, 2000, six weeks before his federal limitations period was scheduled to expire, Downs sent letters to two of his attorneys. In the first, he wrote:

> I don't know if I misunderstood you or what, but when we talked about a month ago, I was left with the impression that my State writ had been filed, and now I find out it's not. You said a legal call would be easy to do. So how about setting one up so we can talk. I . . . want to know what's going on.

In the letter to his second attorney, Downs wrote:

6

> I was told back in May that my state writ was done and ready for filing . . . . [N]ow I find out that my state writ hasn't even been filed. I want to know what's going on! You said yourself that my one year to be in federal court is up next month. So why all this time with nothing in state, especially when I thought I was already in state court[?]

Counsel did not respond to Downs' demand for explanation and did not file either a state or federal habeas petition for more than one month.

At long last, on October 18, 2000—the 365th day of Downs' federal limitations period—counsel filed a state habeas corpus petition, thereby temporarily tolling what little remained of Downs' federal habeas deadline. Several weeks later, Downs' lead counsel resigned. A new attorney was appointed to handle Downs' case, but he too resigned one month after being assigned to the case.

Under Florida law, an attorney may not serve as lead counsel representing a capital litigant unless he or she is "a member in good standing of The Florida Bar, with not less than 3 years' experience in the practice of criminal law, and . . . ha[s] participated in at least five felony jury trials, five felony appeals, or five capital postconviction evidentiary hearings or any combination of at least five of such proceedings." Fla. Stat. § 27.704(1). When Downs' second lawyer resigned in November 2000, no other attorneys at CCRC-N office were qualified to handle Downs' case although CCRC-N remained Downs' counsel of record. The office

7

obtained a continuance in Downs' case which remained in place from November 2000 until June 2001, when new counsel was finally hired and assigned to the case.

While the state habeas petition remained pending, Downs took additional steps to insure his lawyers would preserve his right to federal review. On June 17, 2001, Downs wrote his newly-assigned counsel directing them to waste no time in filing either a state writ of coram nobis or a federal habeas petition:

> Let's not take any chances . . . [A]fter the present writ is argued, I want you to either file what was discussed in state court [the writ of coram nobis] or go ahead and initiate my federal appeal and then move to have it stayed while we return to state court.

Counsel responded with a promise to "be up the first full week in September with a draft."

Although Downs did not have access to any of his legal papers (since they were in his attorneys' possession), Downs prepared for his meeting with counsel by drafting a *pro se* habeas petition listing the issues he wished to raise in federal court, to compare to the draft his lawyers had promised to bring him. However, when counsel arrived to meet with Downs on September 7, 2001, they did not bring a draft of any state writ or federal petition. Downs gave them a copy of the petition he had drafted himself.

Later that day, a frustrated Downs wrote to counsel with the following directive:

8

> If you're not going to protect my right to a federal appeal by filing what you said you would in state court (and it's pretty clear that you're not going to), then I want you to go ahead and file my federal appeal. You said yourself today, that because [a former CCRC-N attorney] waited one year to file my state writ, that I have to be in federal court no later than the day the pending writ is denied. So no more waiting. Go ahead and file my federal appeal.

Counsel responded by letter on September 20, 2001, "noting [Downs'] temperate yet firm rebuke." The response did not indicate, however, whether counsel had taken action as directed.

Wishing to confirm counsel had filed the petition as he had directed, the following week Downs spoke with an investigator from CCRC-N who was visiting the prison where Downs was incarcerated. The investigator was unable to provide information regarding the status of Downs' habeas petition.

Downs alleges that his lead attorney was abusing alcohol and living out of his car during the time he represented Downs. Concerned counsel's alcoholism was delaying the filing of his habeas petition, Downs wrote to another attorney working on his case:

> I saw . . . an investigator from your office last Tuesday . . . . I tried talking to [him] about the status of my federal appeal, but he said [CCRC-N attorney Harry] Brody would have to respond to legal matters. Every time I've seen Brody it's ob[v]ious that he has been drinking. His condition was so bad this last visit that he damn near fell out of his chair. . . . In all candor, his condition concerns me greatly.

9

> Does Brody understand the importance of protecting my right to federal review? I keep telling him to initiate federal action now instead of waiting to see if the writ is denied by the Florida Supreme Court. He keeps saying that if the state writ is denied, there will be a petition for rehearing followed by a mandate. But what if the court denies the writ and says no rehearing will be entertained. Then what?! He needs to understand that my federal appeal needs to be initiated now, instead of waiting.

On September 26, 2001, the Florida Supreme Court denied Downs' state habeas corpus petition, *Downs v. Moore*, 801 So. 2d 906 (Fla. 2001), and on October 11, 2001, Downs' counsel filed a motion for rehearing. On November 1, 2001, without explanation, counsel returned Downs' draft habeas petition, stating simply, "I am returning your petition." Counsel did not indicate whether a formal habeas petition had been filed, but Downs could have reasonably inferred from the return of his *pro se* petition that counsel either had filed the petition as directed, or was prepared to do so on the day the Florida Supreme Court denied the pending petition for rehearing.

One month later, on December 3, 2001, the Florida Supreme Court denied the motion for rehearing. Downs' attorneys did not file his § 2254 federal habeas corpus petition until nine days later, on December 12, 2001. Shortly thereafter, Downs fired his counsel, and proceeded *pro se* in the district court.

D.  Federal Habeas Petition

In his federal habeas petition, Downs raised 13 grounds for relief, including claims that his trial and appellate counsel were ineffective and that the State withheld exculpatory evidence from him in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).  At Downs' request, the district court stayed the petition for several years to allow Downs to exhaust an ineffectiveness claim in state court.

In 2004, the case was reopened, and on October 24, 2004, the district court dismissed the petition as untimely.  The court found Downs' federal limitations period had expired October 17, 1999, one day before his attorneys filed the state habeas corpus petition.  The district court held in the alternative that even if the state habeas corpus petition had been timely filed, Downs' federal habeas petition was nevertheless untimely because it was filed nine days after the state petition was denied on rehearing.

Downs argued he was entitled to equitable tolling because, although he was diligent in pursuing his case, his attorneys' repeated unresponsiveness and misrepresentations were beyond his control.  The district court did not hold an evidentiary hearing and made no findings of fact with respect to Downs' allegations.  Instead, citing Circuit precedent holding that mere attorney negligence is not sufficient to warrant equitable tolling, the district court concluded that

11

Downs was "bound by his attorney's error even though he did not acquiesce in counsel's conduct."

In the opinion dismissing Downs' petition, the district court noted Downs' allegation that his attorney was ineffective for failing to adduce evidence that Downs had not shot Harris. Acknowledging the allegations could be read as a claim Downs was innocent of any capital offense, the district court ultimately concluded Downs did not intend to raise an actual innocence claim. Nonetheless, the court held Downs had failed to present any new evidence or allege any facts which would support such a claim.

On appeal, this Court granted a certificate of appealability, limited to the following issues:

> (1)     Whether attorney misconduct going beyond mere negligence can be an "extraordinary circumstance" warranting equitable tolling of the limitations period in 28 U.S.C. § 2244(d)(1). *See United States v. Martin*, 408 F.3d 1089, 1093 (8th Cir. 2005) (stating that "serious attorney misconduct, as opposed to mere negligence, may warrant equitable tolling"); *Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003); *Spitsyn v. Moore*, 345 F.3d 796, 801-02 (9th Cir. 2003); *United States v. Wynn*, 292 F.3d 226, 230 (5th Cir. 2002); *Nara v. Frank*, 264 F.3d 310, 320 (3d Cir. 2001), *abrogated in part by Carey v. Saffold*, 536 U.S. 214, 122 S. Ct. 2134 (2002).

> (2)     Assuming attorney misconduct going beyond mere negligence can be an "extraordinary circumstance" warranting equitable tolling, whether Petitioner would be entitled to equitable tolling under the facts of this case.

(3)     Whether the petition should be reviewed on the merits because of Petitioner's claim of alleged actual innocence. *See House v. Bell*, __ U.S. __, 126 S. Ct. 2064, 2077 (2006); *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 865 (1995); *Sibley v. Culliver*, 377 F.3d 1196, 1205 (11th Cir. 2004).

## II.  DISCUSSION

Ordinarily, when a state prisoner's conviction becomes final following the termination of his direct appeal, he has one year in which to file a federal petition for a writ of habeas corpus.  28 U.S.C. § 2244(d)(1).  That time is tolled by statute whenever a properly filed motion for state postconviction relief is pending.  28 U.S.C. § 2244(d)(2).

We granted a COA to decide whether Downs is entitled to equitable tolling of his limitations period.  Equitable tolling is an extraordinary remedy, however, and courts may permit its use only when other methods of tolling are unavailable. *Justice v. United States*, 6 F.3d 1474, 1480 (11th Cir. 1993) ("It is a longstanding maxim of Anglo-American law that relief in equity generally is inappropriate when the moving party has an adequate remedy at law.").  Therefore, the first question we must answer is whether statutory tolling alone makes Downs' petition timely.

A.  Statutory Tolling

Downs' federal limitations period began to run October 18, 1999, the day the Florida Supreme Court issued its mandate denying his second motion for postconviction relief under Fla. R. Crim. P. 3.850.  *See* 28 U.S.C. § 2244(d)(2);

13

*Nyland v. Moore*, 216 F.3d 1264, 1267 (11th Cir. 2000) (holding that 3.850 motion remains pending until mandate issues). The district court interpreted § 2244(d)(1)'s one-year rule to mean the limitations period expired October 17, 2000, 365 days after the mandate issued. Although that calculation appears to comply with the statutory directive limiting the limitations period to "one year," this Court has suggested that the limitations period should be calculated according to the "anniversary method," under which the limitations period expires on the anniversary of the date it began to run. *Ferreira v. Sec'y, Dep't of Corr.*, 494 F.3d 1286, 1289 n.1 (11th Cir. 2007) (noting that limitations period should be calculated using "the anniversary date of the triggering event"); *accord United States v. Hurst*, 322 F.3d 1256, 1260-61 (10th Cir. 2003); *United States v. Marcello*, 212 F.3d 1005, 1008-09 (7th Cir. 2000). Applying the anniversary method to this case means Downs' limitations period would have expired October 18, 2000—not October 17, 2000, as the district court held. We emphasize the period "would have" expired because the filing of Downs' state habeas petition tolled the limitations period during the pendency of that petition. *See* 28 U.S.C. § 2244(d)(2).

Although the district court erred in finding Downs' petition was filed one year and eight days after his habeas limitations period expired, the court did not err

14

in finding the petition untimely. As Downs all but concedes,[4] because his attorneys waited until the eleventh hour to file his state habeas petition, he was required to file his federal habeas petition on December 4, 2001, the next business day following the Florida Supreme Court's denial of his petition for rehearing. *See* Fed. R. Civ. P. 6(a)(1) (excludes from computation "the day of the act, event, or default that begins the period"). Instead, the petition was filed December 12, 2001, eight days after the federal limitations period expired.

B. Equitable Tolling

Because Downs' petition was untimely filed, the district court could not consider it unless eight or more days of the federal limitations period were to be equitably tolled. Concluding that this Circuit's precedent barred the application of equitable tolling under the circumstances of this case, the district court dismissed the petition. We review that decision *de novo*. *Helton v. Sec'y for Dep't of Corr.*, 259 F.3d 1310, 1312 (11th Cir. 2001).

---

[4] In his briefs, Downs makes the tenuous argument that the Florida Supreme Court's failure to issue a mandate in his direct appeal means his federal limitations period has not yet begun. Under Florida law, a "judgment and sentence become final for purposes of the rule 'when any such direct review proceedings have concluded and jurisdiction to entertain a motion for post-conviction relief returns to the sentencing court.'" *Marrero v. State*, 967 So. 2d 934, 936 (Fla. 2d DCA 2007) (quoting *Ward v. Dugger*, 508 So. 2d 778, 779 (Fla. 1st DCA 1987)). In the normal course of events, Downs' conviction would not have become final until the mandate issued, *see* Fla. R. App. P. 9.340(a). However, over the course of two decades, Downs has ignored the missing mandate, and filed five motions for postconviction review. These motions received extensive consideration in the Florida trial and appellate courts, which expressed no concern about their jurisdiction to do so. Under these circumstances, we will not second-guess the Florida courts' administration of their postconviction review process.

15

Equitable tolling is a remedy that must be used sparingly, *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000); that is, in extreme cases where failure to invoke the principles of equity would lead to unacceptably unjust outcomes, *see, e.g., Justice*, 6 F.3d at 1479 (citing David D. Doran, Comment, *Equitable Tolling of Statutory Benefit Time Limitations: A Congressional Intent Analysis*, 64 Wash. L. Rev. 681, 682 (1989) ("Equitable tolling, like all equitable remedies, emerged as the 'equity courts' response to injustices resulting from decisions of the 'law courts' in cases involving inequitable conduct.")). Our precedents establish that equitable tolling of the limitations period is warranted "when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." *Steed*, 219 F.3d at 1300 (internal quotation marks omitted).

This Court has used equitable tolling to extend the federal limitations period for prisoners seeking federal review of their state convictions on at least two prior occasions. In both cases, however, the petitioners' untimely filing was caused by erroneous information supplied to them by state courts—not by egregious attorney misconduct. *Spottsville v. Terry*, 476 F.3d 1241, 1245 (11th Cir. 2007); *Knight v. Schofield*, 292 F.3d 709, 711 (11th Cir. 2002). On many occasions, we have explained that "[m]ere attorney negligence [will] not justify equitable tolling,"

16

*Steed*, 219 F.3d at 1300, a point which the Supreme Court recently affirmed in *Lawrence v. Florida*, — U.S. —, 127 S. Ct. 1079, 1085 (2007).

Seven of our fellow circuits have confronted whether attorney misconduct going beyond "mere negligence" may ever constitute an extraordinary circumstance warranting equitable tolling. Although the severity of misconduct addressed by each Circuit has varied greatly, the Courts of Appeals for the Second, Third, Fifth, Ninth, and Tenth Circuits have concluded that some forms of serious attorney misconduct may entitle a habeas petitioner to equitable tolling of the federal limitations period. The Court of Appeals for the Seventh Circuit disagrees.[5] Until now, this Circuit has not been faced with the issue.

The Court of Appeals for the Seventh Circuit has adopted a bright-line approach to requests for equitable tolling premised on the misconduct of a petitioner's attorney. Applying agency principles, the circuit holds that an attorney's actions are always attributable to the client in the context of postconviction proceedings. *See Powell v. Davis*, 415 F.3d 722, 727 (7th Cir. 2005); *Modrowski v. Mote*, 322 F.3d 965, 968 (7th Cir. 2003). The Seventh

---

[5] Two additional circuits have not had occasion to rule on the question directly, but have discussed generally the relationship between attorney misconduct and equitable tolling. The Court of Appeals for the First Circuit has suggested that although "garden-variety" misconduct is not a ground for equitable tolling, "[t]his does not mean, however, that attorney error can never be among the grounds for equitable tolling." *See Trapp v. Spencer*, 479 F.3d 53, 60 (1st Cir. 2007). The Court of Appeals for the Fourth Circuit, in dicta, favorably discussed agency theory. *Rouse v. Lee*, 339 F.3d 238, 249 (4th Cir. 2003) (en banc).

17

Circuit has recognized only one exception to the agency rule and that is the constitutional right to counsel which arises in the context of direct criminal proceedings. *See Johnson v. McBride*, 381 F.3d 587, 590 (7th Cir. 2004). Because petitioners have no constitutional right to counsel in federal postconviction proceedings, *Coleman v. Thompson*, 501 U.S. 722, 752-54, 111 S. Ct. 2546, 2566-68 (1991), the Seventh Circuit has held the severity of attorney misconduct in habeas proceedings is irrelevant for purposes of equitable tolling. No level of attorney misconduct can ever warrant equitable tolling because all acts of malfeasance are attributed directly to the petitioner. *Powell*, 415 F.3d at 727 ("[A]ttorney misconduct, whether labeled negligent, grossly negligent, or willful, is attributable to the client. . . .").

Respondents urge this Court to follow the lead of the Seventh Circuit by holding that a client is always bound by the mistakes of his attorney, regardless how extreme or far afield from the client's directives those actions may be. The approach has its merits. Not only is it easy to administer, but it recognizes the important distinction between criminal proceedings in which the right to counsel is "fundamental and essential," *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 796 (1963), and postconviction proceedings, in which the provision of

18

counsel is a matter of legislative grace.[6]  Moreover, the "your lawyer, your fault"

approach is consistent with the general principle that lawyers are agents, and

"clients must be held accountable for the acts and omissions of their attorneys."

*Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 396, 113 S.

Ct. 1489, 1499 (1993).

The Supreme Court itself has invoked agency principles to hold a habeas

petitioner to his lawyer's error, albeit in a different context.  In *Coleman*, 501 U.S.

at 753-54, 111 S. Ct. at 2566-67, counsel for habeas petitioner Roger Coleman

filed an untimely appeal in state court, thereby depriving the state courts of an

opportunity to consider many of Coleman's federal claims on postconviction

review.  After his unexhausted claims were dismissed as procedurally defaulted,

Coleman appealed, contending his lawyer's negligence constituted "cause" for

reinstating the claims under the "cause and prejudice" test.  *Id.* at 753, 111 S. Ct. at

2566.  Resting its decision on concerns about federalism, the Supreme Court

disagreed.  *Id.*  The Court noted defendants have no constitutional right to

postconviction counsel, and therefore no means of imputing their counsel's errors

---

[6] As an indigent capital defendant, Downs was entitled to postconviction counsel under federal and state law.  *See* 18 U.S.C. § 3599(a)(2); Fla. Stat. § 27.702(1).  That does not mean, however, that he was entitled to effective assistance *per se*.  *Lawrence*, 127 S. Ct. at 1085-86 ("[A] State's effort to assist prisoners in postconviction proceedings does not make the State accountable for a prisoner's delay [in filing his habeas petition]. . . .  It would be perverse indeed if providing prisoners with postconviction counsel deprived States of the benefit of the AEDPA statute of limitations.").

19

to the State; therefore, "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Id.* at 753, 111 S. Ct. at 2566-67 (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986)).

Although *Coleman* arose in a different procedural posture and implicated federalism concerns not at issue in this case, it is instructive insofar as it makes the point—which we do not dispute—that an attorney's ordinary negligence may be attributed to the client under general principles of agency. What *Coleman* does not address, however, is whether agency theory bars relief when a habeas petitioner who has fairly presented his federal claims to the state court invokes equitable tolling based on the egregious misconduct of postconviction counsel.

Although the Seventh Circuit's decision in *Powell* suggests the agency rule is absolute, the rule has several well-recognized exceptions. For example, under fundamental tenets of agency law, a principal is not charged with an agent's actions or knowledge when the agent is acting adversely to the principal's interests. *See In re JLJ Inc.*, 988 F.2d 1112, 1116 (11th Cir. 1993) ("[T]he general rule is that an agent's act against the interest of the principal is void . . . ."); *Schlueter v. Varner*, 384 F.3d 69, 81 (3d Cir. 2004) (Ambro, J., dissenting) ("[W]hen . . . an attorney ceases altogether to serve the interests of his client, the law of agency is

20

clear that the attorney acts alone."); *Baldayaque*, 338 F.3d at 154 (Jacobs, J., concurring) ("[W]hen an agent acts in a manner completely adverse to the principal's interest, the principal is not charged with the agent's misdeeds."); *see also* Restatement (Third) of Agency § 5.04 (2006) ("[N]otice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person."). Extending this rule to the habeas context, it has been suggested that when an attorney's conduct is so egregious it amounts to a *de facto* termination of representation, it would be improper to hold the client to the actions of his agent. *See, e.g.*, *Baldayaque*, 338 F.3d at 155 (Jacobs, J., concurring); *see also Rouse*, 339 F.3d at 250 n.14 (equitable tolling may be appropriate where attorney misconduct reaches the level of "utter abandonment").

Although the law of agency is useful in analyzing the attorney-client relationship in many contexts, the exceptions to the rule reveal agency theory has its limits. The rule that a petitioner must always bear the consequences of his attorney's misconduct is unequivocal—yet bright-line rules do not govern the court's exercise of its equitable powers. *See Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999) ("As a discretionary doctrine that turns on the facts and circumstances of a particular case, equitable tolling does not lend itself to bright-

21

line rules."); *accord Spitsyn*, 345 F.3d at 801; *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000). In the words of Justice Frankfurter, "Equity eschews mechanical rules; it depends on flexibility." *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S. Ct. 582, 584 (1946).

It is perhaps for this reason that every Circuit Court of Appeals other than the Seventh to have answered the question directly takes the position that serious attorney misconduct may constitute an extraordinary circumstance for purposes of equitable tolling. *See Martin*, 408 F.3d 1093 ("serious attorney misconduct, as opposed to mere negligence, may warrant equitable tolling") (quotations omitted); *accord Fleming v. Evans*, 481 F.3d 1249 (10th Cir. 2007)*; Baldayaque*, 338 F.3d 145; *Spitsyn*, 345 F.3d 796; *Wynn*, 292 F.3d 226; *Nara*, 264 F.3d 310. These courts have recognized a critical distinction between mere attorney negligence and serious misconduct, holding that the former does not warrant equitable tolling because it is not an extraordinary circumstance. *See, e.g.*, *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96, 111 S. Ct. 453, 458 (1990) ("[T]he principles of equitable tolling . . . do not extend to what is at best a garden variety claim of excusable neglect."); *Baldayaque*, 338 F.3d at 152 (noting "simple mistakes about the rules applied to the deadlines for filing of habeas petitions" are "ordinary"). But when an attorney's actions extend beyond everyday mistakes into the realm of serious misconduct, these courts hold that in some circumstances such malfeasance

22

may be "far enough outside the range of behavior that reasonably could be expected by a client that [it] may be considered 'extraordinary.'" *Id.*

Thus, our fellow circuits have declined to impute attorney misconduct to a client where the attorney has made misrepresentations to the client, disregarded the client's instructions, refused to return documents, or abandoned the client's case. In *Baldayaque*, for example, the petitioner's attorney ignored a directive to file a petition under 28 U.S.C. § 2255, failed to conduct any legal research, wrongly advised the petitioner's wife that the filing period had expired, and failed to meet or speak with the petitioner at any point during the representation. *Id.* The Second Circuit held these actions, taken together, constituted extraordinary circumstances that might warrant equitable tolling. *Id.*

Similarly, in *Fleming*, the Tenth Circuit held equitable tolling might be appropriate where an attorney made repeated misrepresentations to his client over the course of a year concerning the status of the client's petition for state post-conviction relief. 481 F.3d at 1256-57. Nearly a year before the expiration of the AEDPA limitations period, Fleming's mother had retained an attorney to represent Fleming in state post-conviction proceedings. *Id.* at 1256. On several occasions, Fleming inquired into the status of his state petition (the filing of which would toll the federal limitations period, *see* 28 U.S.C. § 2244(d)(2)), and repeatedly received false assurances that the petition was being prepared and would be filed shortly.

23

*Id.* When no petition was filed, Fleming drafted his own petition and submitted it to the attorney for review and filing. The attorney, however, failed to file the petition until the AEDPA limitations period had expired. *Id.* The Tenth Circuit held these allegations, at a minimum, warranted an evidentiary hearing to determine whether Fleming was entitled to equitable tolling in light of the attorney's misconduct. *Id.* at 1256-57.

In *Martin*, the Eighth Circuit granted equitable tolling to a petitioner whose attorney disregarded instructions to file a motion under § 2255, repeatedly lied to the petitioner and his wife about the filing deadline and the status of the case, refused to communicate with the petitioner or his family, and failed to return the petitioner's documents. 408 F.3d at 1090-91, 1096. The Fifth and Ninth Circuits have condoned the use of equitable tolling under similar circumstances, extending the federal limitations period when, among other things, counsel lied about filing a habeas petition, *Wynn*, 292 F.3d at 230, and failed to file a federal habeas petition after being instructed to do so, *Spitsyn*, 345 F.3d at 801-02.

We believe the fact-specific, case-by-case approach taken by the majority of our fellow circuits is better suited to an equitable inquiry than is the bright-line approach to egregious attorney misconduct adopted by the Seventh Circuit.[7] In

---

[7] By condoning the methods employed by our fellow circuits in conducting an equitable analysis, we do not suggest we would arrive at the same result were we to confront the facts presented those courts. We confine our analysis to the facts before us only, and reserve for

24

determining whether Downs has alleged extraordinary circumstances that, if true, would entitle him to relief, we must consider all relevant facts. These include his unequivocal, repeated demands that his attorneys file his habeas petition; his close tracking of his attorneys' work and the applicable federal deadlines; and his counsel's overt deception in representing they had filed a tolling petition in state court when they had not in fact done so, thereby depriving him of several months of his statutorily-guaranteed one-year federal limitations period.

Although Downs' persistence resulted in his counsel ultimately filing his state habeas petition one day before his federal limitations period expired, his counsel's deceit and delay nonetheless put him in an untenable position. We say untenable because there was no way Downs, imprisoned as he was, would receive notice of the state court's ruling in time to file his federal petition within the one day remaining in his federal limitations period. Thus, throughout the course of their representation, counsel thwarted Downs' best efforts to file a timely petition, working against his interests at every turn.

Beyond those facts (which are highly troubling in themselves), we note that Downs, a capital defendant seeking first-time federal review of his constitutional

---

another day the question whether facts such as those presented in *Baldayaque*, *Fleming*, *Martin*, *Wynn*, and *Spitsyn* would constitute extraordinary circumstances under the law of this Circuit.

claims, filed his petition a mere eight days outside the statutory limitations period.[8]

*Cf. Lonchar v. Thomas*, 517 U.S. 314, 324, 116 S. Ct. 1293, 1299 (1996) ("Dismissal of a *first* habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty."); *accord Wynn*, 292 F.3d at 230.

In reviewing counsel's alleged conduct, we again emphasize Downs was represented by the same counsel throughout his state and federal postconviction proceedings. During the course of representation, counsel's alleged behavior ran the gamut from acts of mere negligence to acts of gross negligence to acts of outright willful deceit. In considering whether the conduct of counsel was extraordinary, we will not dissect the continuing course of conduct in which counsel engaged, but rather view counsel's behavior as a whole. Consequently, although the culminating event which rendered Downs' federal habeas petition untimely was counsel's late filing of the petition, that ordinary act of negligence cannot be isolated from counsel's allegedly egregious misconduct.

In the end, we cannot say whether extraordinary circumstances are present that entitle Downs to equitable tolling because the district court made no findings

---

[8] Although Downs is a capital defendant, we have not given that fact any special weight in assessing whether he may be entitled to equitable tolling. We note that *Barbour v. Haley*, 471 F.3d 1222, 1231-32 (11th Cir. 2006), suggests this Circuit would not favor such an approach. *See also Johnson*, 381 F.3d at 590-91; *Rouse*, 339 F.3d at 253-54. *But see Fahy v. Horn*, 240 F.3d 239, 244-45 (3d Cir. 2001); *Trapp*, 479 F.3d at 61.

26

of fact with respect to whether counsel's behavior was as appalling as Downs alleges and the written record suggests. We can, however, answer the question on which the certificate of appealability was granted: Assuming Downs' allegations are true, he has shown the existence of extraordinary circumstances.

Our precedents require not only "extraordinary circumstances," but also circumstances that are beyond the petitioner's control and unavoidable even with diligence. *See Sandvik*, 177 F.3d at 1271; *Johnson v. Florida Dep't of Corr.*, 513 F.3d 1328, 1332 (11th Cir. 2008). In this case, the facts Downs has alleged, if true, meet both standards.

We have held on previous occasions that "[d]ue diligence . . . does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts." *Aron v. United States*, 291 F.3d 708, 712 (11th Cir. 2002). "Moreover, the due diligence inquiry is an individualized one that must take into account the conditions of confinement and the reality of the prison system." *Id.* (internal quotations omitted). The facts Downs alleges, if true, establish that he acted with due diligence to ensure his petition would be timely filed. Between June and November 2001, Downs wrote to three CCRC attorneys to express concern over the running of the AEDPA filing period and to urge the filing of his federal habeas petition or an additional state court pleading. In addition, Downs attempted to assist his attorneys in drafting his

27

federal petition by providing them with either a draft petition or a list of issues to be included in the petition. These allegations suggest Downs acted with appropriate diligence.

That leaves one final question: whether the extraordinary circumstances allegedly presented by this case were beyond Downs' control. Neither our precedents nor those of other courts have lingered much on this final prong of the equity analysis, often collapsing it into the question whether extraordinary circumstances have been shown. *See, e.g.*, *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S. Ct. 1807, 1814 (2005) ("a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way"); *Lawrence*, 127 S. Ct. at 1085 (same); *Arthur v. Allen*, 452 F.3d 1234, 1252 (11th Cir. 2006) (equitable tolling "may be applied if the petitioner demonstrates (1) diligence in his efforts to timely file a habeas petition and (2) extraordinary and unavoidable circumstances"). As in the context of diligence, a petitioner need not show that superhuman efforts might have enabled him to surmount the extraordinary obstacles which impeded his timely filing. He must, however, demonstrate that the extraordinary circumstances which impeded his timely filing were ones he was reasonably unable to control.

If the facts Downs has alleged are true, he has made the required showing. The egregious misconduct of Downs' lawyers was not of a kind Downs could immediately ascertain. Evidence of his lawyers' untrustworthiness surfaced slowly and counsel's communications throughout the course of representation left it unclear whether and when counsel had drafted and filed Downs' state and federal habeas petitions. Downs took prudent, persistent action to remind his lawyers of imminent deadlines and did his best to remain informed of the status of his state court proceedings as they related to his federal limitations period. Yet, despite sending regular letters to counsel, participating in periodic meetings, and requesting confirmation that his state and federal motions were being drafted and filed in a timely manner, Downs was misled by his lawyers. Counsel lied about having filed Downs' state habeas petition in the summer of 1999, depriving him of as many as three months of his federal limitations period during a time in which he had no reason to suspect his case was not proceeding in a timely fashion.[9]

Once his lawyers' deceit came to light, Downs had less than six weeks left before his federal limitations period expired. During this time, his lawyers maintained possession of his legal files. Unfortunately, because his lawyers

---

[9] According to Downs, lawyers asked him to review a draft of the state habeas petition in late May 1999. It is unclear at what point in the summer he was falsely told the petition had been filed. It appears from his letters to counsel that he uncovered the truth shortly before September 3, 1999.

continued to delay, by the time Downs' state habeas petition was finally filed, his federal habeas limitations period had all but expired. With only one day remaining in which to file a timely federal petition following the denial of his state habeas petition, Downs had little choice but to continue relying on counsel: had he fired his lawyers and tried to file a petition himself after he received notice of the state court's decision, he would have missed the one-day window for filing and had he tried to file a petition on his own, it would have been stricken.[10] Further, Downs reasonably could have inferred from counsel's return of his pro se federal petition that counsel either had filed the petition as directed or were prepared to do so the day the Florida Supreme Court denied the pending petition for rehearing.

Given the unique way in which the facts allegedly unfolded in this case, we conclude the extraordinary circumstances that led to the untimely filing of Downs' habeas petition "stood in his way," *Lawrence*, 127 S. Ct. at 1085, and were "beyond his control," *Sandvik*, 177 F.3d at 1271. In reaching this conclusion, we emphasize that today's opinion does nothing to alter the fact that ordinary attorney negligence does not warrant equitable tolling. *Lawrence*, 127 S. Ct. at 1085; *Howell*, 415 F.3d at 1252. When an attorney miscalculates a deadline, fails to

---

[10] Downs filed his federal habeas petition in the Middle District of Florida. That court routinely strikes and returns pro se filings of parties who are represented by counsel, which means that "even a savvy petitioner, who may see the clock running out on his habeas time, can only cajole [or] plead with his counsel to file the petition timely." *Thomas v. McDonough*, 452 F. Supp. 2d 1203, 1206-07 (M.D. Fla. 2006).

30

adequately raise a potentially meritorious claim, or otherwise makes a run-of-the-mill mistake, a habeas petitioner must live with the consequences of the error. In this case, however, the alleged misdeeds of Downs' counsel went far beyond miscalculating the date on which his federal petition was due. Counsel allegedly lied to Downs on a matter of legal importance and evinced utter disregard for Downs' repeated directive to file his habeas petition. Weighing those facts with the other unique aspects of Downs' case described above, we find that, if proven, his allegations establish circumstances so extraordinary, conduct so diligent, and misconduct so far outside his control, as to merit equitable tolling of some portion of Downs' federal limitations period. Therefore, we vacate the district court's finding that equitable tolling is unequivocally unavailable under the facts of this case.

Ultimately, whether equitable tolling is warranted is a decision that must rest on facts, not allegations. On remand, the district court should conduct an evidentiary hearing to determine whether the facts Downs has alleged are true, and to make any additional factual findings relevant to the equitable tolling analysis. Then, should the facts of this case prove to be as extraordinary as Downs has alleged, the district court should determine what period of time should be equitably tolled.

We note generally that equitable tolling would not be available for any period of time following December 4, 2001, when Downs' federal limitations period expired. *Cf. Moore v. Crosby*, 321 F.3d 1377, 1381 (11th Cir. 2003) (finding statutory tolling does not operate to revive an expired limitations period). Assuming the facts before us are true, an obvious choice for equitable tolling would be from the time Downs' counsel told him his state habeas petition had been filed to the time it became clear to Downs that counsel's representation was a lie. Nevertheless, not knowing how the facts will unfold at the evidentiary hearing, we do not pre-judge the time for which equitable tolling may be available. We leave that ultimate decision in the capable hands of the district court.

C. Actual Innocence

As an alternate ground for relief, Downs contends that the district court erred by refusing to consider whether his claim that he is ineligible for (or "actually innocent of") the death penalty entitled him to federal habeas review of any procedurally defaulted claims. *Schlup v. Delo*, 513 U.S. 298, 315, 115 S. Ct. 851, 861 (1995) (claim that constitutional error led to conviction of innocent person is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.").

A petitioner who claims that he is ineligible for the death penalty may obtain review of defaulted federal claims only if he shows that "no reasonable juror would have found [him] eligible for the death penalty under the applicable state law" had the jury heard the evidence his lawyer failed to present at trial or sentencing. *Sawyer*, 505 U.S. at 336, 112 S. Ct. at 2517; *Johnson v. Singletary*, 938 F.2d 1166, 1183 n.46 (11th Cir. 1991). Downs points to four pieces of evidence not presented at his trial which he contends entitle him to relief. These include the deposition of his deceased grandmother, who provides an alibi for him at the time of the murder; the deposition testimony of his sister, who names her ex-boyfriend, Larry Johnson, as the triggerman; and first and second-hand statements of a co-conspirator naming Johnson as the shooter.

Although we note the substance of much of this evidence was presented to and considered by the jury that resentenced Downs to death in 1991, *see Downs*, 572 So. 2d at 898-99, we need not decide at this time whether his claim of actual innocence entitles him to review of any claims that may be defaulted. On remand, should the district court find Downs is not entitled to equitable tolling, it should consider whether Downs is entitled to review of his defaulted claims under the *Sawyer* standard.

**VACATED AND REMANDED.**

33